# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Max*, 2012 IL App (3d) 110385

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILLIE S. MAX, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0385 |
| Filed | November 19, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In defendant's prosecution for theft from the convenience store where she worked, the prosecutor's comments about reasonable doubt in closing argument did not cause the jury to apply a lesser standard of proof and the trial court did not err in refusing to appoint a special prosecutor. |
| Decision Under Review | Appeal from the Circuit Court of Grundy County, No. 08-CF-71; the Hon. Robert C. Marsaglia, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Stephanie Speakman, of Mokena, and Jeffery J. Tomczak (argued), of Law Office of Jeff Tomczak, of Joliet, for appellant. |
| | Johnathan M. Bates, State's Attorney, of Morris (Terry A. Mertel and Robert M. Hansen (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Presiding Justice Schmidt and Justice McDade concurred in the judgment and opinion. |

## OPINION

¶ 1     After a jury trial, defendant, Billie S. Max, was convicted of theft in excess of $10,000 (720 ILCS 5/16-1(a)(1)(A), (b)(5) (West 2006)) and sentenced to a period of probation and county-jail time and ordered to pay restitution. Defendant appeals her conviction, arguing that: (1) the State committed reversible error by improperly attempting to define reasonable doubt for the jury in rebuttal closing argument; (2) the trial court erred in denying defendant's posttrial motion to appoint a special prosecutor; (3) her trial counsel was ineffective; (4) she was not proven guilty beyond a reasonable doubt; and (5) she was denied a fair trial because of the cumulative effect of various trial errors. We affirm the trial court's judgment.

¶ 2                                    FACTS

¶ 3     In April of 2008, defendant was charged with theft in excess of $10,000 from MKM Oil Company, Inc. (MKM). The charge was in relation to an alleged theft of money, which took place from about August 2007 through April 2008, from an automated teller machine (ATM) at a gas station and convenience store in Mazon, Illinois, where defendant worked.

¶ 4     Defendant's case proceeded to a jury trial in February 2010. Prior to trial, defense counsel made a motion *in limine* to prevent the State's expert witness from testifying that the ATM in question was working properly during the relevant period. Defense counsel alleged that such an opinion was improper because the expert had not personally inspected the ATM and because there had been numerous repairs made to the ATM both during and after the relevant period. After a hearing, the trial court denied the motion, finding that defense counsel's arguments went to the weight of the evidence and not to admissibility.

¶ 5     During the jury selection process, at various times, the trial judge informed the potential jurors that the State had the burden to prove defendant guilty beyond a reasonable doubt, that defendant was presumed innocent throughout the trial, and that defendant did not have to testify or present any evidence.

-2-

¶ 6    After the jury was selected, the evidence phase of the jury trial began. The State presented numerous witnesses. Robert Seabright testified for the State that he was an area supervisor for MKM, which operated several gas stations and convenience stores (collectively referred to as stores). Seabright had been an area supervisor for several years and, as such, was responsible for directing the activities of the individual store managers, supervising store conditions, and hiring management personnel as required. Seabright supervised eight stores, one of which, during 2007 and 2008, was the store in Mazon, Illinois. In performing his job duties, Seabright called and visited the stores several times per week and picked up store packets, which contained the daily store reports and supporting documents, such as supplier invoices, maintenance receipts, invoices for repair services, bank deposit receipts, credit-card tickets, ATM receipts, and ATM reports.

¶ 7    For each store, there was one store manager and either one or two assistant managers. The store manager's responsibilities included ordering and receiving merchandise, properly accounting for all of the sales cash receipts, depositing the sales cash receipts in the bank, and refilling and restocking the ATM. Each day, the store started out with $1,000 in cash for making change. Anything above that amount was supposed to be deposited in the bank. Store managers were required to prepare a daily store report (daily report), which reflected for the previous day the cash coming into the store and where that cash went, either to the bank, or to the ATM, or to other places. The report was configured as a balance sheet with funds coming into the store listed on one side of the sheet and funds going out of the store listed on the other side of the sheet. According to Seabright, the two sides were supposed to be equal, although that rarely occurred. Typically, the amounts listed on the two sides were within a few dollars of each other. After the daily report was prepared, it was placed into a packet for the day. Seabright picked up the packets from the stores two or three times per week, took the packets to the MKM office in Gardner, Illinois, and turned the packets over to the accounting personnel. Seabright did not inspect the contents of the packets and stated that doing so was not one of his responsibilities as area manager.

¶ 8    MKM took over the Mazon store in April or May 2007. Defendant was initially hired to be the manager of the store in Morris, Illinois, but was transferred to the Mazon store in about July 2007. As part of the interview process, defendant submitted to a background check, and no problems were found. Defendant also successfully completed manager training at the Coal City store.

¶ 9    When MKM took over the Mazon store, a new ATM was installed. To access the ATM, a password, a combination, and two keys were required. Between July 2007 and April 2008, only defendant and Seabright had access to the ATM in the Mazon store, and defendant was the only one who was responsible for replenishing the cash in the ATM. According to Seabright, when the password was entered, the ATM would print out a small receipt showing the amount of cash that had been dispensed so that the store manager would know how much money to put back into the ATM. The receipt was supposed to be attached to the daily report. The Mazon store kept $1,500 in the ATM. In the bottom of the ATM was a cassette box that held the money. The box had a spring-tension mechanism that pushed the bills forward to dispense them. According to Seabright, the store manager would use the previous day's cash receipts to replenish the ATM. The amount put into the ATM to replenish it would be

entered on the daily report in the space provided. Typically in the Mazon store, the ATM was replenished about three times per week.

¶ 10    Seabright stated that between August 1, 2007, and March 31, 2008, he did not access the ATM at the Mazon store for any reason and did not replenish the cash in that machine. Seabright acknowledged that there was no place on the daily report for the manager to write in the amount that had been dispensed from the ATM but stated that there was a place for the manager to write in the amount that had been put in the ATM to replenish it.

¶ 11    On Friday, April 11, 2008, Seabright went to the Mazon store and accessed the ATM. Prior to doing so, he had received a request from Mary Ann Laufer, the auditing person in MKM's Gardner office, to obtain the ATM journal report. According to Seabright, the ATM journal, which was printed directly from the ATM, listed every transaction from that particular ATM since the last time the journal was printed. When Seabright arrived at the store that day, defendant was working. Seabright did not explain to defendant what he was doing with the ATM, and defendant did not ask. Seabright printed the ATM journal, rolled it up, and turned it over to Laufer.

¶ 12    The Mazon store had a security system with eight cameras located in various spots throughout the store. Activity in the area of a camera would cause the camera to start recording. After 30 days, the recording system would start recording over the old images, unless the data was saved to a compact disc. In addition to video surveillance, there was also a live feed over the Internet from the Mazon store to the Gardner office so that someone working in the Gardner office could see in real time what was going on in the Mazon store. Defendant was aware of the cameras. During the trial, a video of about 20 minutes from the surveillance cameras was played for the jury. One segment of the video showed defendant accessing the ATM; another showed defendant counting money in the back office. According to Seabright, there was nothing out of the ordinary in the video regarding defendant's actions. Seabright stated that during the relevant time period, defendant was authorized to remove money from the Mazon store to take to the bank for the purpose of making a deposit. Defendant was not authorized to remove money from the Mazon store for any reason other than a business purpose. Seabright testified further that to the best of his knowledge, there had not been any discrepancies with the balance sheet between the daily reports and the ATM receipts.

¶ 13    On April 12, 2008, the day after he retrieved the ATM journal from the Mazon store, Seabright drove to the Mazon store and found one of the part-time employees working. The employee told Seabright that defendant had resigned and that her resignation was in the back office.

¶ 14    The ATM at the Mazon store was purchased new from Welch Systems, and Welch had agreed to maintain the machine for a period of time. If there was a problem with the ATM, defendant was supposed to contact Dan Joyce, who was the maintenance supervisor for any work that was to be done in the store. On cross-examination, Seabright was shown maintenance records for the ATM. The records indicated that the ATM had been serviced at various times while defendant was employed at the store and after defendant resigned for different problems, including problems with the cash dispenser. Seabright initially testified

that he was not aware of those problems but, when questioned further, stated that he repeatedly told defendant to call Dan Joyce.

¶ 15    According to Seabright, it was defendant's responsibility as manager to print out and turn in the ATM journal on a monthly basis with the daily reports that were being turned in for that period. Seabright stated that defendant was very good about preparing the reports and was a very good employee as far as being on time, not missing work, and not causing any problems. At some point, however, there was a problem with defendant switching hours with the assistant manager, Kim. Defendant and Seabright had words about that issue, and that issue was referenced in defendant's resignation letter. Defendant eventually terminated Kim after giving her several write-ups for problems with her performance.

¶ 16    Mary Ann Laufer testified for the State that she worked at MKM's Gardner office doing auditing work. As part of her job responsibilities, Laufer compared the daily store reports with the supporting documents to make sure that all of the numbers were supported and correct, that there were no discrepancies, and that the two sides of the daily report balanced. Corrections to the daily report were made by the Gardner office in red pen. In 2007, Laufer was responsible for auditing 15 to 20 stores. For each store, every daily report was audited.

¶ 17    In about January 2007, Laufer's job responsibilities were expanded and she became responsible for helping set up a computer program that MKM was implementing at the various stores. The program allowed the stores to input their numbers electronically so that they could be transmitted directly to Laufer. Another person, Julie Jacobsgaard, was hired in September 2007 to take over Laufer's auditing responsibilities.

¶ 18    In April 2008, Laufer reviewed the documentation for the Mazon store while working on the computer program for that store. Laufer noticed that there were no ATM reports with the documentation. The ATM reports would have showed how much cash had been dispensed from the machine. Laufer asked Jacobsgaard about the discrepancy, and Jacobsgaard told her that they had not gotten any ATM reports from the Mazon store in quite a while. Laufer looked through the daily reports and found that they had not received any ATM reports from the Mazon store since July 2007. Laufer ran some reports on the Internet through Welch, which showed how much had been dispensed each day, and determined by comparing those reports with the daily reports from the Mazon store that there was a considerable discrepancy. Laufer asked Seabright to obtain the ATM journal from the Mazon store. Laufer also met with Cathy Setterlund of Welch to verify that her findings were correct.

¶ 19    At the time of trial, Jacobsgaard no longer worked for MKM. Laufer testified that she did not know whether the packet of daily reports from the Mazon store contained the ATM reports when they were received at the Gardner office because Jacobsgaard was doing the auditing work at that time and would have received those packets. Laufer stated that she could tell from comparing the total of the deposits to the total that was dispensed that over $50,000 was missing. Laufer stated that she spot-checked Jacobsgaard's work during the relevant period but did not notice that the ATM reports were missing.

¶ 20    Catherine Setterlund testified for the State that she was an installations project manager for Welch Systems, which sold and serviced ATMs and other money-handling equipment. Setterlund's job responsibilities included training individuals on the use and balancing of

-5-

ATMs. Setterlund had been balancing ATMs for approximately 10 years on a daily basis and had balanced ATM records thousands of times. According to Setterlund, it was important to balance an ATM to make sure that it was functioning properly and to make sure that no one was stealing from the ATM. Setterlund described for the jury how an ATM worked and the process of balancing an ATM. Setterlund stated that to balance an ATM, she would compare two documents: the ATM journal, which was created by and printed from the actual ATM, and the processor journal, which was created by the processor at the processor location and could be accessed through a Web site. According to Setterlund, the two records should be identical–what the ATM journal indicated was dispensed should be the exact same amount that the processor journal indicated was dispensed. If the records matched up, the ATM was functioning properly.

¶ 21　　Welch had contracted with MKM to process and service MKM's ATMs. In April 2008, Setterlund was asked to balance the ATM in the Mazon store. Setterlund reviewed the ATM journal and the processor journal and determined that they balanced and that the ATM was functioning properly. Setterlund stated that it was her opinion that the ATM in the Mazon store was working properly for the period in question because there were no discrepancies between the journal and processor records. Setterlund acknowledged that various repairs were made to the ATM during that period but stated that the repairs did not reflect any issues in dispensing or doing transactions on the journal.

¶ 22　　In reviewing the records, Setterlund determined that there was a shortage between the amount of money that was allegedly put into the ATM over the relevant time period and the amount that was actually put into the machine. The amount of the shortage was $64,460, calculated as follows: $1,120 in August 2007; $5,740 in September 2007; $9,320 in October 2007; $9,940 in November 2007; $7,360 in December 2007; $8,340 in January 2008; $10,060 in February 2008; $10,080 in March 2008; and $2,500 in April 2008.

¶ 23　　Setterlund did not know if Welch had an indemnification agreement with its clients but stated that at least one time in the past when a client of Welch had lost money because of a faulty ATM, Welch had reimbursed the client. Setterlund stated further, however, that she was paid the same amount regardless of whether she determined that an ATM was functioning properly or improperly.

¶ 24　　After the State rested its case-in-chief, the defense presented several witnesses of its own. The parties stipulated to the testimony of Officer Jeffrey Marques of the Mazon police department that on April 12, 2008, at 11:51 a.m., he was called to the Shell gas station in Mazon to investigate a theft complaint. Upon arrival, Marques spoke to Seabright. Seabright told Marques that defendant, who was the store manager, had been stealing money from the store. According to Seabright, an auditor had checked the books from the ATM and found that there was money missing. Seabright told Marques further that there was at least $50,000 missing and that the monthly balance sheets had not been turned into the office in Gardner for at least six months. Seabright indicated to Marques that a secretary who was supposed to be checking the reports in Gardner was approving the figures without the reports.

¶ 25　　Lieutenant Detective Mark Smyk of the Grundy County sheriff's department testified for the defense that he was in charge of the investigation of the theft in the present case. Smyk

interviewed defendant on April 28, 2008. At the time of the interview, Smyk already had a warrant for defendant's arrest for the theft. During the interview, defendant denied that she took the money. Defendant also denied that she had a drinking, drug, or gambling problem. After the interview, defendant was arrested. As part of the investigation, the police did not interview any of defendant's friends or family members regarding her financial condition, they did not attempt to obtain a search warrant or consent to search defendant's house for items that may have been purchased with the stolen money, they did not check with the Secretary of State to determine how many vehicles defendant owned or whether there was any money owed on those vehicles, and Smyk was not sure whether the police had attempted to subpoena defendant's financial records. Smyk did not take notes during his interview of defendant and did not make a police report of the interview.

¶ 26        Defendant testified in her own behalf that she was 43 years old as of the trial date and that in 2007 and 2008, she lived in a house in Mazon near the store in question with her three children. Defendant's children at the time were 18, 15, and 13 years old. The children's father was paying child support of $900 per month and was also paying for the children's health insurance. Defendant's rent was $750 per month and her other household bills were about $400 per month. At some point during that time, defendant's boyfriend moved into the house with them, and defendant and her boyfriend split the rent payment. Defendant owned one vehicle at the time, which she purchased used for about $13,000. Her car payments were about $269 per month for four years, and her insurance payment was about $125 every three months. Defendant did not have any credit cards, was not on public assistance, and did not have any other debt. Prior to MKM taking over the Morris store, defendant worked at that location about 40 hours per week and was paid $9.50 per hour as the assistant manager. In that job, defendant handled cash on a daily basis but did not make bank deposits and was not the person responsible for refilling the ATM. As the manager of the Mazon store, defendant was scheduled 50 hours per week and was paid a salary.

¶ 27        When MKM took over the Morris store, defendant applied for a management position and was interviewed by Seabright. She submitted to a background check and a drug test. Defendant received manager training at the Coal City store from Renee Kalmes. The training lasted only one week because Kalmes was going on vacation the following week. During her training week, defendant shadowed Kalmes for the first two days to learn the job, and Kalmes shadowed her the last few days to make sure she learned the position. At the end of the week, defendant was given a test over the training material. As part of the training, Kalmes showed defendant how to access the ATM, how to recount and refill the dispenser, where the documentation for the ATM was, and where the data for the ATM was written down. Defendant was not given any written information regarding how to maintain an ATM and did not receive any written material or guidance on the ATM from Welch. In the training, defendant was taught a specific procedure for refilling the ATM. Defendant would open up the ATM, pull the cassette, take the cassette back to the office, remove the money from the cassette, count and double count the money, determine how much money was to be replaced, count and double count that money from the store's daily cash, place the refill amount into the cassette, and return the cassette to the machine. To determine how much money to put back into the machine, defendant was taught not to rely on the printout from

the machine but, rather, to actually count and verify the amount of money that was in the cassette. Defendant was instructed to list on the right side of the store's daily report for the ATM entry the amount of cash that was placed into the ATM to refill it. Defendant was also taught to fill out a monthly ATM log. The monthly ATM log contained entries for every date of access and listed the access date, the amount of cash itself, and the number of bills. Defendant would make an entry on the daily report to show how much money she had put into the ATM and would simultaneously make an entry on the monthly ATM log. The monthly ATM log was kept in the store for the month and was turned in after the month was over with the monthly inventory report. According to defendant, during her training, she was not taught to compile an ATM journal other than the monthly ATM log, and she did not know what an ATM journal was.

¶ 28    In about the middle of July 2007, defendant was transferred to the Mazon store to work as the store manager. Defendant was aware that the Mazon store had a video surveillance system and knew that the video was streamed live to the Gardner office.

¶ 29    On April 11, 2008, when Seabright came into the store, defendant was on her way to the bank. Defendant said good morning to Seabright and left to go to the bank to make her deposit. When defendant came back to the store, Seabright was pulling receipts from the ATM. Defendant had never seen Seabright pulling receipts from the ATM before, had never pulled those types of receipts (a roll) from the ATM herself, and had never been instructed to do so. Seabright remained at the store for the majority of the day. Seabright did not say anything to defendant while he was at the ATM. Although defendant knew she was going to quit her employment at the Mazon store, she did not tell Seabright at that time.

¶ 30    Defendant stated that she was never reprimanded for not filling out a daily report properly or for not filling out a monthly ATM report. The procedure she followed for refilling the ATM in the Mazon store was the same procedure that she learned during her training: enter the code, open the cassette, take the cassette back to the office, count the money, verify the count, refill the dispenser, and document the amount. Seabright also had keys to the ATM. According to defendant, her monthly ATM logs were always in the packets she turned in and she was never asked by anyone at MKM where her monthly ATM reports were.

¶ 31    At some point, a problem developed at the Mazon store with the assistant manager, Deb Clevenger. Defendant wrote up Clevenger six or seven times and eventually terminated Clevenger's employment. After defendant fired Clevenger, she was called by Seabright and told that Mr. Marketti, one of the owners, wanted her to put Clevenger back on the schedule. Defendant turned in a new schedule to Seabright, which showed only Clevenger listed because all of the other employees were willing to quit if defendant was forced to bring Clevenger back. After about a week, Clevenger officially resigned. According to defendant, she and Seabright had a good relationship at first, but their relationship deteriorated over time because of the situation with Clevenger.

¶ 32    According to defendant, she prepared her letter of resignation on the date listed at the top of the letter, which was before Seabright came into the store on April 11. Prior to that time, no one from MKM or the police had approached defendant about any missing money.

Although defendant knew she was leaving, she did not just abandon the store. Defendant finished out the day that Friday (April 11); went in the next morning with her keys; filled out the paperwork, the payroll, and the store order; and made sure that everything was done so that the employees would be paid. Defendant left her keys, her uniform, and her letter of resignation in the back office.

¶ 33    Later that same day, Officer Marques called defendant and asked her if she would meet with him regarding an incident at the store. Defendant knew Marques previously because their children went to school together and because Marques came into the Mazon store frequently. Defendant drove to the Grundy County sheriff's department and met with Marques and another officer in an interview room. She was read and waived her *Miranda* rights. The interview lasted about 15 minutes. The other officer did the questioning. The other officer asked defendant if she knew that there were problems with the ATM in the store, told defendant that there was money missing, and asked defendant whether she took the money. Defendant told the officer that she did not take the money, that there was no money missing, and that she knew that the ATM had problems. When asked if she would be at the store if the police had more questions, defendant told the officer that she had resigned from the store the previous day. During the interview, no specific amount of money was mentioned to defendant by the police as the amount of money that was missing. After the interview, defendant was allowed to leave.

¶ 34    On April 28, 2008, officer Marques again contacted defendant and asked her if she would answer more questions. Defendant agreed. Marques met defendant at her house and drove her to the Grundy County sheriff's department. Defendant again waived her *Miranda* rights and was interviewed by the police, this time by Detective Smyk. The interview lasted about 45 minutes. Smyk had a manilla folder in front of him and told defendant that he had all the documents he needed and that he knew she stole a substantial sum of money from the store. Defendant told Smyk that she did not take any money and that he needed to check the ATM. Upon inquiry, defendant told Smyk further that she did not drink, gamble, or use drugs, that she only had one bank account, and that the police could check her account. Smyk offered defendant a notepad to make a written statement, but defendant declined. According to defendant, the officers were not abusive toward her and she was treated fairly well. After the interview, defendant was placed under arrest.

¶ 35    Defendant testified further that after she turned in the monthly ATM logs, she never saw those documents again. Defendant stated that she was instructed by Seabright to call Dan Joyce and not Welch about any problems with the ATM. It was Joyce's decision how to proceed. According to defendant, she was reprimanded at one point because she contacted Welch directly. Defendant stated that the ATM was down regularly and that she repeatedly called Joyce about problems with the ATM. According to defendant, customers at the store complained about how slow the ATM was, about it being out of service, and that they did not receive the right amount of money. Defendant told Seabright about the complaints and would also contact Joyce if it was a mechanical problem. Defendant stated that one customer she could think of by name, Jeremy Verons, was given extra cash by the ATM on four or five occasions. Defendant was unable to identify other individuals by name but stated that she could identify them by face. Defendant stated that she made Seabright aware of the problems

with the ATM and was repeatedly told to call Joyce.

¶ 36    Defendant showed her letter of resignation to two other employees before Seabright came into the store on April 11, 2008. Defendant stated that she had personal issues with two of the owners of MKM, Mr. Marketti and Mr. Kavanaugh, and felt as if they were harassing her. Defendant did not have another job lined up when she resigned and did not find another job until July 2008. Defendant admitted that when she resigned, she was no longer happy at MKM and did not feel that her work was being appreciated. According to defendant, she did not tell Seabright that she was quitting when she saw him in the store on April 11 because his demeanor toward her that day was very aggravated and angry.

¶ 37    On cross-examination, the prosecutor went through several of the daily reports with defendant and had defendant testify as to the amounts indicated in the reports as to such things as the gross daily receipts for the store, the amounts put into the ATM, and the amounts deposited at the bank. Defendant acknowledged that she was the person who filled out that information on the daily reports and that red checkmarks on the daily reports indicated that the reports had been verified by MKM's auditor. Defendant acknowledged further, however, that there were no red checkmarks by the ATM box on the daily reports that she was shown in court.

¶ 38    In rebuttal, Renee Kalmes testified for the State that she worked for MKM as manager of the Coal City store. Kalmes had been a manager for several years and had trained managers of other stores, including defendant. According to Kalmes, she never told defendant to count the money in the ATM cassette as part of the procedure for refilling the ATM. Kalmes would merely rely on the printed receipt from the machine as to how much money needed to be replaced. Kalmes would, however, count the money that she was putting in the machine to refill it. According to Kalmes, the store managers did not have to personally verify what was actually in the cassette because the area manager, Bob Seabright, would do that.

¶ 39    In addition to the testimony presented, various documents were admitted into evidence throughout the course of the trial. Some of the documents that were admitted included the daily reports of the Mazon store, the deposit slips and receipts for the Mazon store, the processor transaction summary for the ATM, defendant's letter of resignation, and the maintenance records for the ATM.

¶ 40    At the conclusion of the evidence, the attorneys made their closing arguments. The State argued that it had proven defendant guilty beyond a reasonable doubt. During the summation portion of closing argument, the prosecutor specifically commented about "reasonable doubt," stating:

> "The first thing that the judge is going to tell you, or one of the first things is that the State has the burden of proof in this case, and we acknowledge that and we accept that. That's our responsibility. It's our responsibility to prove beyond a reasonable doubt, and I expect that's the standard that Judge Marsaglia is going to tell you, that we have to prove beyond a reasonable doubt that Billie Max engaged in a theft from MKM Oil. And I'm confident that after you order all of the evidence and consider it all, I think that you'll find that we have done that.

Now, beyond a reasonable doubt, there's–there's no dictionary definition of that. I would suggest to you that if you imagine a balance–"

At that point, defense counsel objected, and the objection was sustained.

¶ 41    During his closing argument, defense counsel argued that the State had failed to show that any money was missing or, if so, that defendant took any money. Defense counsel pointed out that the police did not interview defendant's coworkers or defendant's ex-husband, that they did not obtain defendant's financial records or determine the number of cars defendant owned, and that there was no indication that defendant had bought expensive items for herself or her children.

¶ 42    In the rebuttal portion of closing argument, the prosecutor again specifically commented about "reasonable doubt," stating:

"We all know better in our heart of hearts exactly what went on here. And when you know inside your heart of hearts, you know we have met our burden of proof of proving Billie Max guilty beyond a reasonable doubt, and we don't have to show where she spent the money. We don't have to show that she bought a car. We don't have to show that she bought a wardrobe. We don't have to show any of that stuff. All we have to show is that she took the money out of the account, and that's shown because she's the one who was handling it."

No objection was made to that comment.

¶ 43    After closing arguments were completed, the trial court instructed the jury on the law. Of relevance to this appeal, the jurors were again instructed that the State bore the burden of proof, that defendant was presumed innocent, and that defendant did not have to testify or present evidence. The jury was also instructed that opening statements and closing arguments were not evidence. When the jury instructions were completed, deliberations began. The jury eventually found defendant guilty of theft in excess of $10,000.

¶ 44    Defense counsel filed a motion for new trial, alleging, among other things, that: (1) defendant was not proven guilty beyond a reasonable doubt; (2) the trial court erred in allowing Setterlund to testify that the ATM was working properly; and (3) the prosecutor made prejudicial, inflammatory, and erroneous statements in closing arguments. In a hearing on the motion, defense counsel elaborated further on the third allegation and stated that he was referring to a comment by the prosecution that defendant could have called a certain witness to testify, which defense counsel argued improperly shifted the burden to the defense. Defense counsel did not make reference to the prosecutor's comments about "reasonable doubt." At the conclusion of the hearing, the trial court denied the motion for new trial. Following a sentencing hearing, defendant was sentenced to a period of probation and county-jail time and ordered to pay restitution.

¶ 45    At some point after sentencing, defendant hired a new attorney. Defendant's new attorney filed a motion to reconsider the sentence and a supplemental motion for new trial. In the supplemental motion, defendant's new attorney alleged, among other things, that: (1) trial counsel was ineffective in failing to make a record of certain sidebar conferences that had occurred, in failing to object to the admission of bank records without any foundation, and in failing to call an expert witness to testify that it was impossible to determine whether the

ATM was dispensing money properly without actually viewing the ATM in question; (2) the prosecutor's attempts to define "reasonable doubt" during closing argument constituted prosecutorial misconduct; (3) the State had failed to disclose a conflict, that the Grundy County sheriff, Terry Marketti, was the brother of Richard Marketti, the president of MKM; and (4) the State failed to prove the case beyond a reasonable doubt. In a footnote, the supplemental motion for new trial stated that in April 2010, after defendant was convicted, a donation of $1,000 was made by MKM to the committee to elect the Grundy County State's Attorney, who was one of the prosecutors in the case. An attachment to the motion showed that similar donations of smaller amounts had been made by MKM for several years.

¶ 46　　Defendant's new attorney also filed a motion for the appointment of a special prosecutor, alleging that a special prosecutor was required because of the appearance of a conflict within the case (as alleged in the supplement motion for new trial). An evidentiary hearing was held on that issue. At the hearing, Grundy County Sheriff Terry Marketti testified that he was the brother of Rick Marketti. Rick was one of the partners of MKM. Terry had never had any ownership interest in MKM and had never been an officer, shareholder, or employee of MKM. Terry testified further that he owned a gas station and that he purchased gasoline for his station from MKM at the same price that it was offered to everyone else. At the conclusion of the evidentiary hearing, the motion for a special prosecutor was denied.

¶ 47　　An evidentiary hearing was also held on the supplemental motion for new trial. At the hearing, defendant's trial counsel testified that he did not specifically remember the sidebar conferences and did not make any notes regarding those conferences, but that it was his practice to make a record of sidebar conference if he felt that the issue was something that was important to preserve for appeal. Trial counsel testified further that he discussed the case with an expert on several occasions but decided not to call the expert to testify because he did not think that it would be helpful to defendant's case in that the expert would have stated that the State's numbers and "paper trail" were correct as far as the loss involved. Trial counsel did not remember the expert stating that there was no way to tell if the ATM was functioning correctly without viewing it in person and stated that he did not believe that statement was what the expert had told him. Trial counsel commented further that the ATM at the Mazon store was not in the same condition as when defendant worked there because the cash dispenser had been replaced at some point after defendant resigned. Trial counsel was aware that Richard Marketti of MKM and Terry Marketti, the Grundy County sheriff, were brothers but did not raise that fact at trial because he did not believe it was relevant and thought that the effect of that information on the jury might have gone either way, depending upon the makeup of the jury.

¶ 48　　At the conclusion of the evidence, the trial court took the supplemental motion for new trial under advisement. The trial court later denied the supplemental motion and also denied the motion to reconsider sentence. This appeal followed.

¶ 49　　　　　　　　　　　　　　　ANALYSIS

¶ 50　　On appeal, defendant argues first that the State committed reversible error by improperly attempting to define "reasonable doubt" for the jury in rebuttal closing argument. Defendant

asserts that the State's comment regarding what the jurors knew in their "heart of hearts" was a clear attempt to define reasonable doubt in such a manner as to lessen the State's burden of proof and to encourage the jury to base its verdict upon emotion rather than logic. Defendant asserts further that since the evidence in this case was closely balanced, she suffered substantial prejudice as a result of the State's erroneous reasonable-doubt instruction. Defendant recognizes that this issue may have been forfeited because trial counsel did not object to the comment at trial but argues that we should reach the merits of this issue, nevertheless, under the plain error doctrine.

¶ 51    The State argues first that the issue has been forfeited and that plain-error review does not apply. Alternatively, the State argues that no error occurred because the prosecutor's comments were not an attempt to define "reasonable doubt" but, rather, constituted a fair response to defense counsel's remarks in closing argument regarding the State's failure to present evidence to show how defendant had spent the stolen money. The State argues further that the impact of any potential error that occurred was lessened because the trial court properly instructed the jury that closing arguments were not evidence.

¶ 52    The first step in plain-error analysis is to conduct a substantive review of the issue to determine whether an error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). Although the propriety of jury instructions is generally reviewed on appeal for an abuse of discretion, when the issue is whether the applicable law was correctly conveyed by the instructions to the jury, the appropriate standard of review on appeal is *de novo*. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008).

¶ 53    "The due process clause of the fourteenth amendment protects a defendant from conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Green*, 225 Ill. 2d 612, 622 (2007) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). As to instructions on reasonable doubt, the long-standing rule in Illinois was that the term "reasonable doubt" needed no further elaboration and that the trial court and counsel should not attempt to define reasonable doubt for the jury. See, *e.g.*, *People v. Malmenato*, 14 Ill. 2d 52, 61 (1958); *People v. Speight*, 153 Ill. 2d 365, 374 (1992). Applying that long-standing rule, Illinois courts had generally found that an attempt to define reasonable doubt was error, although in some instances, the courts went on to find that the error was not prejudicial to the defendant. See, *e.g.*, *Malmenato*, 14 Ill. 2d at 61; *Speight*, 153 Ill. 2d at 374-75.

¶ 54    However, when considering the due process implications of an instruction that defined reasonable doubt to the jury, the United States Supreme Court stated in *Victor v. Nebraska*, 511 U.S. 1 (1994):

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the

jury.' " *Victor*, 511 U.S. at 5 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

¶ 55    Thus, the United States Supreme Court's ruling in *Victor* establishes that a jury instruction defining reasonable doubt is not automatically erroneous, contrary to the long-standing rule in Illinois, and that such an instruction does not automatically violate a defendant's right to a fair trial as guaranteed by the due process clause. See *Victor*, 511 U.S. at 5; *Green*, 225 Ill. 2d at 622 (adopting some of the language set forth in *Victor* but in a different context). Due process is violated only if, under the totality of the circumstances, there is a reasonable likelihood that the jury understood that the instructions allowed it to find the defendant guilty based upon a standard of proof that was less than beyond a reasonable doubt. See *Victor*, 511 U.S. at 5; *Green*, 225 Ill. 2d at 622; *People v. Layhew*, 139 Ill. 2d 476, 486 (1990) (applying a totality of circumstances test in a somewhat different context to determine whether certain jury instructions denied the defendant a fair trial).

¶ 56    In the present case, after reviewing the record, we find that no due process violation occurred. During the jury selection process and during the jury trial itself, the jury was told numerous times that defendant was presumed innocent and that the State bore the burden of proving defendant guilty beyond a reasonable doubt. Based upon the totality of the circumstances in this case, we do not believe that there was a reasonable likelihood that the jury understood that the prosecutor's comment about reasonable doubt in rebuttal closing argument allowed it to find defendant guilty under a lesser standard of proof. See *Victor*, 511 U.S. at 5.

¶ 57    As her second point of contention on appeal, defendant argues that the trial court erred in denying her posttrial motion to appoint a special prosecutor. Defendant asserts that such an appointment was necessary because of the appearance of impropriety and because the Grundy County State's Attorney, who was one of the prosecutors at trial, had a personal interest in the case. As the basis for that assertion, defendant sets forth the following facts: (1) the Grundy County sheriff, whose office investigated this case, was the brother of the president of MKM, the victim in this case; (2) the Grundy County sheriff also had a business relationship with MKM in that he purchased gasoline from MKM for a gas station he owned; and (3) MKM made a campaign contribution to the Grundy County State's Attorney in a nonelection year after defendant was convicted in this case. Defendant recognizes that this issue may have been forfeited because trial counsel did not raise the issue at trial but argues that we should reach the merits of this issue, nevertheless, under the plain-error doctrine or because trial counsel was ineffective in failing to raise the issue.

¶ 58    The State argues first that the issue has been forfeited and that plain-error review does not apply. Alternatively, the State argues that no error occurred because the law does not require the appointment of a special prosecutor under the facts of the present case.

¶ 59    As noted above, the first step in plain-error analysis is to conduct a substantive review of the issue to determine whether an error occurred. *Walker*, 232 Ill. 2d at 124-25. The determination of whether to appoint a special prosecutor rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *People v. Morley*, 287 Ill. App. 3d 499, 503-04 (1997). The threshold for finding an abuse of discretion

is high–an abuse of discretion will be found only if no reasonable person would take the view adopted by the trial court. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 60    Section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2010)) governs the appointment of a special prosecutor and provides, in pertinent part:

"Whenever the State's [A]ttorney is *** interested in any cause or proceeding, civil or criminal, which it is or may be his duty to prosecute or defend, the court in which said cause or proceeding is pending may appoint some competent attorney to prosecute or defend such cause or proceeding ***." 55 ILCS 5/3-9008 (West 2010).

¶ 61    The purpose of the special-prosecutor provision is to prevent any influence upon the discharge of the State's Attorney's duties by reason of personal interest. *Morley*, 287 Ill. App. 3d at 503-04. A State's Attorney is "interested" in a cause or proceeding only if: (1) he is an actual party in the litigation; or (2) he is interested in the cause or proceedings as a private individual. *Environmental Protection Agency v. Pollution Control Board*, 69 Ill. 2d 394, 400-01 (1977); *Morley*, 287 Ill. App. 3d at 504; *People v. Tracy*, 291 Ill. App. 3d 145, 151 (1997). The appointment of a special prosecutor may also be appropriate where necessary to remove the appearance of impropriety in the prosecution of a defendant or to promote the underlying policy of a just, fair, and impartial proceeding. See *Sommer v. Goetze*, 102 Ill. App. 3d 117, 120 (1981). Mere speculation or suspicion is not enough to justify the appointment of a special prosecutor. *McCall v. Devine*, 334 Ill. App. 3d 192, 205 (2002).

¶ 62    In the present case, the Grundy County State's Attorney (or any member of his office) was not an actual party, witness, or victim in this case. In addition, no evidence was presented to indicate that the State's Attorney had a personal or individual interest in this case. Furthermore, although defendant attempts to suggest the appearance of impropriety, we cannot say from the facts presented regarding the Grundy County Sheriff's relationship to the victim and certain campaign contributions made by the victim to the State's Attorney that it was an abuse of discretion for the trial court to deny defendant's posttrial motion for a special prosecutor. See *Morley*, 287 Ill. App. 3d at 503-04 (the trial court did not commit an abuse of discretion in denying the defendant's motion for the appointment of a special prosecutor, which alleged that the prosecutor involved in the case had a leading role in the decision to employ the police-officer victim as an investigator for the State's Attorney's office); *Tracy*, 291 Ill. App. 3d at 150 (the trial court did not commit an abuse of discretion in denying the defendant's motion for the appointment of a special prosecutor, which alleged that one of the assistant State's Attorneys who had initially been involved in the case was going to testify as a witness at trial regarding an incriminating statement made by the defendant in court); *McCall*, 334 Ill. App. 3d at 205 (the trial court properly denied a mother's motion to appoint a special prosecutor to investigate and prosecute individuals in the police-shooting death of her son).

¶ 63    As her next point of contention on appeal, defendant argues that she was denied effective assistance of trial counsel. Defendant asserts that trial counsel was ineffective in: (1) failing to make a record of sidebar conferences; (2) failing to move for the appointment of a special prosecutor; and (3) failing to call an expert witness to rebut the testimony of the State's expert that the ATM was functioning properly. The State argues that defendant's claims are

without merit and should be rejected.

¶ 64    An issue of ineffective assistance of counsel presents the reviewing court with a mixed question of fact and law. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). To the extent that the trial court's findings of fact bear upon the determination of whether counsel was ineffective, those findings must be given deference on appeal and will not be reversed unless they are against the manifest weight of the evidence. See *Davis*, 353 Ill. App. 3d at 794. However, the ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal. See *Davis*, 353 Ill. App. 3d at 794.

¶ 65    A claim of ineffective assistance of counsel is analyzed under the two-pronged, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). To prevail on a claim of ineffective assistance of counsel, a defendant must show that: (1) defense counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant to the extent that he was deprived of a fair proceeding. *Patterson*, 217 Ill. 2d at 438. A defendant's failure to satisfy either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel. *Patterson*, 217 Ill. 2d at 438. In reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct. See *People v. Cloyd*, 152 Ill. App. 3d 50, 57 (1987). A strong presumption exists that defense counsel's conduct was within the wide range of reasonable professional assistance and that all decisions were made in the exercise of reasonable professional judgment. *Cloyd*, 152 Ill. App. 3d at 56-57; *People v. Martin*, 236 Ill. App. 3d 112, 121 (1992). In addition, matters of trial strategy generally will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *Patterson*, 217 Ill. 2d at 441.

¶ 66    In the present case, after having reviewed the record, we reject defendant's claim of ineffective assistance of counsel. As to the sidebar conferences, we note that defendant's claim is nothing more than speculation. Defendant did not assert that any of the trial court's evidentiary rulings were incorrect, that trial counsel failed to make the necessary objections, or that she was prejudiced by any of the trial court's evidentiary rulings. As to the issue of a special prosecutor, we have already determined that the appointment of a special prosecutor was not required and, thus, we cannot find deficient performance or prejudice in trial counsel's failure to request a special prosecutor. See *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) (defense counsel cannot be considered ineffective for failing to make or pursue meritless objections). Finally, as to defense counsel's decision not to call an expert witness to testify for the defense, that decision was one of trial strategy and does not indicate deficient performance of trial counsel. See *Patterson*, 217 Ill. 2d at 441; *People v. Mehlberg*, 249 Ill. App. 3d 499, 546-47 (1993) (defense counsel was not ineffective in deciding to challenge the State's evidence on cross-examination and through closing argument, rather than presenting an expert witness to refute the State's evidence). Even if we assume that the expert would have testified that it was impossible to determine that the ATM was working properly without viewing it in person, we cannot discount the fact that the expert would have also testified that the State's paper trail was correct as to the amount of the loss and, in that

regard, would have provided testimony that was harmful to defendant's case. The trial court, after hearing the allegations and evidence as to ineffective assistance and after having viewed the entire trial, found that trial counsel did a "fine job" representing defendant. We see no indication in the record that trial counsel was ineffective.

¶ 67     As her fourth contention on appeal, defendant argues that she was not proven guilty beyond a reasonable doubt of theft in excess of $10,000. Defendant asserts that the State failed to prove that the amount in question was stolen, or that if it was, that defendant was the person who stole it. In making that assertion, defendant notes that the State failed to investigate her finances or home and failed to present any evidence of where the money could have gone. In addition, defendant notes further that she testified at trial that she did not take the money.

¶ 68     Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). The reviewing court will not retry the defendant. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. See *Jimerson*, 127 Ill. 2d at 43. Thus, the *Collins* standard gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Jackson*, 232 Ill. 2d at 281 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or jury trial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *Jackson*, 232 Ill. 2d at 281; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard, a reviewing court will not reverse a conviction unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt of the defendant's guilt. *Jackson*, 232 Ill. 2d at 281; *People v. Flowers*, 306 Ill. App. 3d 259, 266 (1999).

¶ 69     To sustain the charge of theft in excess of $10,000 in the present case, the State had to prove the following four elements beyond a reasonable doubt: (1) that MKM was the owner of the property in question; (2) that defendant knowingly exerted unauthorized control over that property; (3) that defendant intended to deprive MKM permanently of the use and benefit of the property; and (4) the value of the property was in excess of $10,000. 720 ILCS 5/16-1(a)(1)(A), (b)(5) (West 2006); Illinois Pattern Jury Instructions, Criminal, No. 13.12 (4th ed. 2000).

¶ 70     Viewed in the light most favorable to the State, the evidence presented at trial was sufficient to meet that burden. The only factual issues at trial were whether money was missing and, if so, whether defendant took the money. As to those issues, the State presented the expert testimony of Catherine Setterlund that the ATM was functioning properly and that there was a shortage of $64,600 for the relevant period between the amount of money that defendant said she was putting into the ATM and the amount of money that was actually put

into the ATM. In addition, the State presented the testimony of Bob Seabright that only he and defendant had access to the ATM and that defendant was the only person to handle the money in the ATM. Defendant provided testimony that was similar to that of Seabright. Under the *Collins* standard, the evidence presented was sufficient to prove defendant guilty. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280. Defendant's assertions to the contrary on appeal are essentially the same arguments that were made at trial and rejected by the jury. We will not retry this case on appeal (see *Jimerson*, 127 Ill. 2d at 43) or substitute our judgment for that of the jury (see *People v. Akis*, 63 Ill. 2d 296, 298-99 (1976)).

¶ 71 As her final contention on appeal, defendant argues that she was denied a fair trial and due process because of the cumulative effect of all of the errors that occurred at trial. See *People v. Johnson*, 215 Ill. App. 3d 713, 734-35 (1991) (although individual errors in a trial may not merit reversal alone, the cumulative effect of those errors may deprive defendant of a fair trial such that due process and fundamental fairness would require that the case be remanded for retrial). As we have determined that none of the alleged errors occurred, we reject defendant's argument on this issue. See *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984) (the Illinois Supreme Court declined to apply the cumulative error doctrine where defendant failed to establish that anything approaching reversible error occurred), *rev'd on other grounds*, *People v. Gacho*, 122 Ill. 2d 221, 262-63 (1988).

¶ 72 For the foregoing reasons, we affirm the judgment of the circuit court of Grundy County.

¶ 73 Affirmed.