**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170584-U

Order filed November 19, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0584 Circuit No. 16-CF-167 |
| ADAM JEFFREY SCOTT, | ) ) ) | Honorable Albert Purham, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Schmidt concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1    *Held*:  The defendant's trial counsel was not ineffective, and the State did not commit prosecutorial misconduct.

¶ 2    On appeal, the defendant, Adam Jeffrey Scott, argues trial counsel was ineffective for failing to: (1) investigate and present key witness testimony, (2) properly cross-examine and impeach the State's witnesses, (3) investigate blood evidence, (4) submit an accomplice witness jury instruction, (5) exclude irrelevant evidence, and (6) object to prosecutorial misconduct.

¶ 3 The defendant also argues that the State committed acts of prosecutorial misconduct when it (1) failed to produce evidence mentioned in its opening statement, (2) improperly led its witnesses, (3) shifted the burden in rebuttal, (4) improperly commented on its witnesses' credibility, and (5) misstated evidence.

¶ 4 I. BACKGROUND

¶ 5 The State charged the defendant with first degree murder (720 ILCS 5/9-1 (West 2016)) in that he knowingly struck Hayward Hudson, a person over 60 years of age, on the head with a "machete type object" with the intent to kill him.

¶ 6 The matter proceeded to a jury trial on October 31, 2016. The State indicated in its opening statement that it would present evidence that the defendant said he was at the victim's house on February 8, 2016, to purchase drugs but did not go back later that night. Additionally, the State mentioned that a witness would testify that the defendant "regularly carries knives." The testimony began with Peoria Police Officer Jacob Bainter who said that, at approximately 2:30 a.m. on February 9, 2016, he was dispatched to a residence. He testified that he entered the residence through the unlocked front door and discovered Hudson deceased with several injuries to his head.

¶ 7 Hudson's daughter testified that she was in contact with her father throughout the day on February 8, 2016. She testified that she had been at his house earlier that day from approximately 2 to 7 p.m. and spoke with him on the phone around 9:30 p.m. She stated that Hudson always locked his front door. She further stated that she told the police that the defendant regularly came to Hudson's residence.

¶ 8 Prior to trial, Jennifer Scott, the defendant's sister, was interviewed by police. During that interview, she described events that took place on February 8 and 9, 2016. On the night of

2

February 8, 2016, she and the defendant were cooking dinner in the defendant's kitchen. Jennifer stated that she accidently cut her thumb on a butcher knife in the kitchen sink. She stated that the cut bled a decent amount, and she believed that she bled onto the cabinets below the sink. At trial, neither party questioned Jennifer or any other witness about this statement.

¶ 9        Jennifer testified that she was visiting the defendant at his apartment on the afternoon of February 8, 2016. While drinking together, the defendant showed Jennifer his knives. Specifically, he showed her a "long, heavy, metal knife" and other knives. In describing the defendant's demeanor, she stated he was upset, but there was nothing out of the ordinary. She testified that, at approximately midnight or 1 a.m., the defendant's friend, Dave Pelsynski, arrived at the apartment. By that point, Jennifer stated she had consumed approximately 12 beers. She also stated the defendant was intoxicated at this time. Pelsynski drove them to Hudson's residence. The defendant was in the front passenger seat, and Jennifer was in the backseat. Jennifer had never been to Hudson's house. She waited in the car with Pelsynski while the defendant went inside. When the defendant returned, he whispered to Jennifer that he "fucked that guy up and he killed him and he was going to kill [Pelsynski] too."

¶ 10        Jennifer described her memory as "fuzzy" on what happened next. She thought they returned to the defendant's apartment, but had difficulty recalling if they went to a body of water first. When they arrived at the apartment, they used heroin. She testified that she had used heroin before, and that at the time of trial, she was a recovering addict. She testified that consuming both beer and heroin caused her to be "extremely intoxicated." Jennifer said the defendant gave both her and Pelsynski each a bag of heroin. She thought that after using the heroin, the three individuals all left in Pelsynski's car again. The seating arrangement was the same as last time with Pelsynski driving, the defendant sitting in the front passenger seat, and Jennifer sitting in

3

the backseat. Jennifer testified that, once they arrived at a body of water, the defendant exited the car and walked toward the water. The defendant was gone for less than five minutes. During this time, she described herself as being in a "very euphoric state and maybe even somewhat in shock because that's the point when I remember trying to distinguish if it was real or not." She described her recollection from that night as "very distorted."

¶ 11    After approximately five minutes, the defendant reentered the car and the three started driving back to the defendant's apartment. At some point, Pelsynski said that he had thrown a beer can out when they were parked near Hudson's residence. She stated they went to retrieve the beer can and returned to the defendant's apartment. When asked if she saw if the defendant had a knife on him the night of the incident, she said "whatever he had, he had it underneath his coat," later clarifying it to be under the left side of his jacket. She testified that she did not see the defendant have a knife upon entering or leaving Hudson's house. Jennifer testified that the defendant was wearing "a black Carhartt coat. It was the same coat he always wore." She recalled herself wearing "some jeans, some boots, a long sleeve shirt, and a coat." Jennifer later testified the coat was a dark green winter coat.

¶ 12    The defendant went to pick up some clothes for Jennifer from their sister, Andrea Scott, the following morning. When he returned, the police arrived at his apartment. Jennifer stayed in the bathroom while the police left with the defendant. She did not make the police aware of her presence.

¶ 13    Defense counsel, Chandra Justice, cross-examined Jennifer on her prior felony convictions. Defense counsel asked her about her circumstances on the day of the murder, specifically her absconding parole and her outstanding warrant. She was also cross-examined on her drug use that night and her ability to recall events.

4

¶ 14    Pelsynski testified that he met the defendant while working at O'Brien Steel. Sometime in the morning on February 8, 2016, Pelsynski called the defendant and inquired about buying heroin. They had previously purchased heroin together. Pelsynski testified that the defendant was the middleman in the drug buys with Hudson. That afternoon, Pelsynski picked the defendant up and drove him to Hudson's residence. Once there, Pelsynski parked a few streets away, and the defendant exited the car and entered Hudson's house. The defendant returned 10 to 15 minutes later with heroin. Pelsynski then dropped the defendant off at his apartment. Later, when Pelsynski opened the bag of heroin, he thought the defendant had shorted him. Pelsynski sent some angry text messages to the defendant. In those messages, Pelsynski threatened he would go to Hudson's house to confront him. The defendant told Pelsynski not to do that, and he would take care of it.

¶ 15    Later that night, Pelsynski was at home with his fiancée, Katherine Zaverl, when the defendant contacted him. Zaverl testified that she knew the defendant because he was friends with Pelsynski. Zaverl received a call from the defendant on her phone around 9:45 p.m., at which point the defendant indicated that he wanted to speak with Pelsynski. The defendant asked Pelsynski to give him a ride to Hudson's house to get Pelsynski the heroin that he was shorted earlier. At approximately 10 p.m., Pelsynski left his house. Upon arriving at the defendant's apartment, Pelsynski met Jennifer. Pelsynski said the defendant was wearing his "Black Carhartt Jacket that he always wore." When they got into Pelsynski's car, Pelsynski was driving, the defendant was in the front passenger seat, and Jennifer was in the backseat. When they arrived at Hudson's residence, the defendant exited the car while Jennifer and Pelsynski stayed in the car. The defendant returned approximately 15 to 20 minutes later and whispered something to Jennifer. Pelsynski then drove back to the defendant's apartment.

¶ 16 Upon arriving at the defendant's apartment, Pelsynski noted that the defendant was still wearing his black Carhartt jacket. The defendant gave Pelsynski additional heroin to make up for being shorted earlier. After using heroin together, Pelsynski entered the kitchen and saw the water running and a "machete-style knife" in the sink that the defendant was standing in front of. The defendant had shown this knife to him, as well as others, and he saw the defendant carry this knife on prior occasions. He described the knife as being about a foot long with a four- to five-inch handle and an eight-inch blade. Pelsynski testified that he saw what appeared to be blood but could not see to the bottom of the sink. While at the defendant's apartment weeks prior, he saw the defendant put a knife in his pocket. Pelsynski testified that he did not see the defendant have the "machete-style knife" earlier on the night of the murder.

¶ 17 When Pelsynski indicated he was leaving, the defendant asked him for a ride to Plant 4 at O'Brien Steel so he could "get rid of something." Pelsynski drove the defendant to Plant 4 and dropped him off around 11 p.m. The defendant told Pelsynski that he had a ride home and exited the car. Pelsynski went home and used heroin before going to bed. He did not leave his apartment again until he left for work the next morning.

¶ 18 The State questioned Pelsynski about a conversation he had with the defendant a couple weeks before February 8, 2016, specifically about the defendant's frustration on a prior drug deal. Pelsynski testified that he drove the defendant to Hudson's house to purchase drugs, and then back to his apartment. After the defendant bought drugs, Pelsynski complained to the defendant about the purchase taking a long time. In response, the defendant stated that he told Hudson to hurry, but "he don't care. He just takes his time." The State then asked, "Did [the defendant] say anything else?" Pelsynski testified that the defendant further stated that he "[o]ught to rob him. Hit him over the head and rob him."

6

¶ 19    Defense counsel cross-examined Pelsynski regarding his drug use and his prior felony criminal history. He admitted that he had been using small amounts of heroin daily for a couple of months prior to the murder. Additionally, he said he was frustrated with Hudson for taking so long on at least one prior drug purchase. He was asked about being angry with the defendant when he got shorted heroin on the day of the murder. He was also questioned on his ability to see into the defendant's sink, the contents of the sink, and his lack of concern when he saw blood in the sink.

¶ 20    On February 9, 2016, an officer made contact with the defendant at his apartment and took him to the police department for an interview. Officers noticed that the defendant's black Carhartt jacket had several tiny red spots on the sleeves. The jacket was collected for further testing. Later that day, a search warrant was executed on the defendant's residence where two knives were discovered and collected as evidence. Upon receiving information of a possible weapon in the river at Plant 4, a dive team searched that area of water, but a weapon was not found. Surveillance video submitted into evidence showed Plant 4 on February 8, 2016, at 10:59 to 11:02 p.m. The video showed an unidentified vehicle drive toward the river. It then showed an unidentified man walk away from the river a short time later.

¶ 21    The defendant and Pelsynski submitted to a buccal swab. On February 10, 2016, an officer executed a search warrant on Pelsynski's vehicle. A chemical was used inside the vehicle which detected the presence of blood on the front passenger seat, floorboard, and door.

¶ 22    The presence of blood was indicated on the left and right sleeves of the defendant's jacket and a portion was cut out for further testing. No blood was found anywhere else on the jacket. The DNA samples provided by the defendant, Pelsynski, and Hudson were compared to the preserved blood stain. Pelsynski's jacket was tested and no blood was found. Pelsynski and

7

the defendant were excluded from contributing to the blood stain on the defendant's jacket. Due to an incomplete sample, the analyst could not determine a match for Hudson to the blood stain. However, of the three DNA samples the analyst received, the sample from Hudson was the only possible contributor.

¶ 23    The coroner testified that Hudson had 13 injuries to his head that caused his death. The wounds were consistent with chop wounds, meaning a heavier-type weapon with at least one sharp cutting edge used in a chopping manner. One example given by the coroner was a machete. The coroner also testified that around $300 was found on Hudson during her examination.

¶ 24    In the defendant's closing argument, defense counsel discredited the State's motive for the murder being robbery since Hudson had nearly $300 on him. Trial counsel also implicated Pelsynski and Jennifer by saying:

> "What happens is people get caught and they start pointing the fingers at other people because we know Jennifer was probably there. She has enough information, I suppose. We know [Pelsynski] was probably there. They both told us they were there, but they are the only ones that are pointing the finger at [the defendant]. We may know that [the defendant]'s coat was there, but we don't know who was wearing it, and we certainly don't know that [the defendant] was there."

¶ 25    The State began its rebuttal argument by saying, "I'm not going to read too many of these instructions, but I think two are appropriate based on Ms. Justice's burden. One deals with circumstantial evidence." The State later stated:

> "[W]hy would his own sister, Jennifer ***, and why would his acquaintance or friend or drug buddy, *** Pelsynski, lie about [the defendant] having done it?

8

Why would they do that? I mean, they came in here under oath in front of a judge, in front of jurors, in front of prosecutors, risking perjury. *** I mean, you haven't heard any evidence to suggest they have any reason whatsoever to frame a man, any man, for murder let alone a brother, a friend."

Similar to the State's opening statement, it again said in its rebuttal argument that the defendant "regularly carries knives."

¶ 26　　　The jury found the defendant guilty of first degree murder. The defendant subsequently made several *pro se* allegations of ineffective assistance of counsel. Specifically, the defendant alleged that trial counsel failed to: investigate other key witnesses, cross-examine and impeach the State's witnesses, investigate blood evidence, submit an accomplice witness jury instruction, exclude irrelevant evidence, and object to prosecutorial misconduct. The circuit court conducted a preliminary *Krankel* inquiry. Upon conclusion of the inquiry, the court appointed counsel to represent the defendant on his *pro se* allegations of ineffective assistance, and the matter proceeded to a full *Krankel* hearing. The following evidence was adduced at the *Krankel* hearing.

¶ 27　　　First, the defendant argued that trial counsel failed to impeach his sister, Jennifer. Specifically, the defendant called several witnesses to provide testimony contradicting Jennifer's testimony that she was wearing a green jacket the night of February 8, 2016. For example, Karen Scott, Jennifer and the defendant's mother, testified that when Jennifer left her house on February 8, 2016, to go to Peoria, she did not have a jacket. Likewise, Joe Jantze, Jennifer's godfather, testified that he drove Jennifer to Peoria on February 8, and she did not have a jacket. Other witnesses provided similar testimony regarding Jennifer not having a jacket on February 8, 2016. Trial counsel testified at the *Krankel* hearing that the green jacket never came into play until Jennifer testified at trial, and the defendant and his family only told counsel that they had

9

observed Jennifer without a jacket after the trial had concluded. After hearing this testimony, the circuit court stated, "[C]asting their testimony in the very best light, their testimony would not have led to a different result or verdict because none of them have any direct knowledge of what the circumstances are of who killed Mr. Hudson. They all just have suspicions about Jennifer." The court found the fact that Jennifer may not have been wearing a jacket to be a minor point of impeachment in light of the other evidence showing that the defendant was wearing his black Carhartt jacket.

¶ 28        Second, the defendant argued that trial counsel failed to appropriately challenge the credibility of Jennifer and Pelsynski. Ultimately, the circuit court found that trial counsel reasonably challenged Jennifer and Pelsynski's credibility by questioning them as to their prior criminal histories and drug use on the date of the offense. The court also found that trial counsel attempted to deconstruct the inconsistencies in both witnesses' testimony.

¶ 29        Third, the defendant argued that trial counsel failed to investigate blood evidence, and specifically, failed to test the blood found in his kitchen sink. Trial counsel was asked if Jennifer's statement in her interview "would have indicated then that any blood found in the kitchen would have been Jennifer's." Trial counsel responded:

> "I can't answer that definitively because if you—if you take into consideration Mr. Pelsynski's interview or testimony where he said he saw [the defendant] rinsing a blood—or knife with blood coming off of it, there was other evidence that blood in there could have been from someone else."

The circuit court agreed and found trial counsel's manner of investigation into the blood evidence to be trial strategy.

10

¶ 30    Fourth, the defendant argued that trial counsel failed to submit an accomplice witness jury instruction as it applied to Pelsynski and Jennifer. The circuit court, however, found that neither Pelsynski nor Jennifer said that they were involved in the murder or had any knowledge of the murder until after the fact. The court determined that there was no evidence presented at trial or during the *Krankel* hearing that would support the use of an accomplice witness jury instruction, therefore, trial counsel was not ineffective for failing to submit such instruction.

¶ 31    Fifth, the defendant argued that trial counsel failed to object to the admission into evidence of two knives found at his residence during the execution of the search warrant on February 9, 2016. He argued that the knives should not have been admitted because they were not used in the crime and were irrelevant. Trial counsel testified that she thought it was helpful for the evidence of the two knives to come in so that she could argue that they had not been used in the offense. The circuit court determined that the defendant's collection of knives and the missing knife were relevant and probative, and noted the missing knife "could possibly have been the murder weapon."

¶ 32    Lastly, the defendant argued that there was pervasive prosecutorial misconduct that trial counsel failed to object to throughout the trial. He argued that the State mischaracterized the evidence when it stated in closing argument that he "regularly carries knives." Additionally, the defendant argued that it was error for the State to comment on witnesses' credibility and their motives to frame him. The defendant stated that this, coupled with the brief statement of "Justice's burden," constituted prosecutorial misconduct that rose to the level of plain error. Therefore, he argued, trial counsel's failure to object to these comments resulted in ineffective assistance. The circuit court found that it was a reasonable inference from the evidence that the defendant "regularly carries knives"; therefore, the statement was not error. The court

11

determined that the State's comments on its own witnesses' credibility and testimony without an objection did not prejudice the defendant or deny him a fair trial. The court further stated that "the prosecution never said [it] must find that there are witnesses lying *** to acquit." Then noted, that even combined with the "regularly carries knives" statement, there was no plain error. The court considered the context of the "burden" statement and how often the word was used in the whole closing argument and other words used in combination with "burden." The court concluded that the State's use of the word "burden" was "probably misplaced" and found there was no error or prejudice created.

¶ 33        Upon conclusion of the *Krankel* hearing, the circuit court expressed its confidence in the jury's verdict and determined that the defendant's ineffective assistance claims lacked merit and trial counsel's decisions during the trial were reasonable. The court subsequently sentenced the defendant to 45 years' imprisonment.

¶ 34                                    II. ANALYSIS

¶ 35        The defendant raises two issues on appeal. First, the defendant argues trial counsel was ineffective for failing to: (1) investigate and present key witness testimony, (2) cross-examine and impeach the State's witnesses, (3) investigate blood evidence, (4) submit accomplice witness jury instruction, (5) exclude irrelevant evidence, and (6) object to prosecutorial misconduct.

¶ 36        Second, the defendant argues the State committed acts of prosecutorial misconduct when it (1) failed to produce evidence mentioned in the opening statement, (2) improperly led its witnesses, (3) shifted the burden in rebuttal, (4) improperly commented on its witnesses' credibility, and (5) misstated evidence.

¶ 37                          A. Ineffective Assistance of Counsel

12

¶ 38      At the outset, the parties dispute our standard of review. The defendant asserts that we review the circuit court's decision *de novo*, and the State argues we review the court's decision for manifest error. The standard of review depends on whether the court determined the merits of the defendant's claims of ineffective assistance of counsel. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. If the court reached no determination on the merits, our review is *de novo*. *Id.* If the court reached a determination on the merits, we will reverse only if the court's determination was manifestly erroneous. *Id.* Here, the court made a determination on the merits of the defendant's claims of ineffective assistance of counsel. *Supra* ¶¶ 27-32. Thus, we will reverse only if the court's action was manifestly erroneous. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Id.*

¶ 39      A defendant presenting a claim of ineffective assistance of counsel must allege facts sufficient to prove both prongs under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), in order to succeed: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). The court gives a great amount of deference to counsel's judgment and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective." *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *People v. West*, 187 Ill. 2d 418, 432-33 (1999) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). "A reviewing

court evaluates the reasonableness of counsel's conduct from his [or her] perspective in light of the totality of the circumstances in the case." *Tucker*, 2017 IL App (5th) 130576, ¶ 54. "[I]f an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). The defendant sets forth six claims of ineffective assistance of trial counsel.

¶ 40                           1. Failure to Investigate and Present Key Witness Testimony

¶ 41        The defendant alleges trial counsel failed to investigate and call key witnesses that would have impeached and implicated Jennifer. "It is well settled that '[d]ecisions concerning which witnesses to call at trial and what evidence to present on the defendant's behalf ultimately rest with trial counsel.' " *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 63 (quoting *West*, 187 Ill. 2d at 432). "These types of decisions are matters of trial strategy, which are generally immune from claims of ineffective assistance of counsel." *Id.*

¶ 42        Here, at trial, Jennifer stated that she had worn a green jacket on the night in question. At the *Krankel* hearing, the defendant presented multiple witnesses who stated that they saw Jennifer on the day in question, and she was not wearing a jacket. However, counsel testified at the *Krankel* hearing that the green jacket never came into play until Jennifer testified at trial, and the defendant and his family only told counsel that they had observed Jennifer without a jacket after the trial had concluded. Counsel is only ineffective for failing to present exculpatory evidence of which counsel is aware. *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009). As counsel was unaware of this evidence, she was not ineffective for failing to raise it. Moreover, as the court noted, this impeachment testimony was minor and did not implicate Jennifer as the defendant was unable to tie Jennifer's lack of a jacket to the murder. There was no evidence presented that Jennifer was wearing the black Carhartt jacket, and more than one person testified

14

at trial that the defendant was wearing it on the night of the murder and always wore it. We cannot say that the court's decision was manifestly erroneous.

¶ 43                    2. Failure to Cross-examine and Impeach State's Witnesses

¶ 44        The defendant asserts trial counsel did not properly cross-examine and impeach certain State witnesses, which directly resulted in her failure to conduct an effective defense. Specifically, the defendant argues that counsel (1) should have clarified a question she asked Jennifer, (2) failed to ask Jennifer about her motive for omitting details in her first interview with the police, (3) should have asked why Jennifer was certain when she spoke to police but uncertain at trial, (4) elicited a detailed description of the knife from Pelsynski, and (5) failed to argue to the jury the discrepancies in Jennifer and Pelsynski's testimony.

¶ 45        Mistakes in trial strategy, tactics, or judgment do not render representation incompetent. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). The fact that another attorney may have pursued a different strategy or asked different questions is not a factor that we consider in determining whether counsel was competent. *Id.* Instead, we view defense counsel's performance as a whole. *People v. Max*, 2012 IL App (3d) 110385, ¶ 65. Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel "failed to conduct any meaningful adversarial testing." *Id.*

¶ 46        The record shows that counsel did cross-examine Jennifer in a way that impeached her credibility. The jury was presented with the inconsistencies and credibility issues in the testimony of Jennifer and Pelsynski. While, in hindsight, the defendant contends that certain questions should have been asked or tactics employed, such does not rise to the level of ineffective assistance of counsel. We cannot say that counsel failed to conduct any meaningful adversarial testing.

15

¶ 47    In coming to this conclusion, we reject the defendant's attempt to analogize this case to *People v. Baines*, 399 Ill. App. 3d 881 (2010). *Baines* provides an extreme example of ineffective assistance. In *Baines*, the defendant's case was built around the victim's mistaken identification. *Id.* at 894. On appeal, the court noted: (1) the defendant had to guide counsel in how to conduct his direct examination of the defendant (*id.* at 888); (2) counsel asked repeated questions of the defendant that bolstered the State's case (*id.*); (3) counsel spent over nine pages of the record cross-examining a witness in a way that made it obvious that counsel was mistaken regarding who the victim identified as his attacker (*id.* at 892); (4) counsel failed to ask obvious follow-up questions (*id.* at 895); (5) the court had to point out, after counsel rested, that counsel still needed to introduce evidence that the defendant's photograph was included in the lineup the victim viewed, and the victim did not identify the defendant (*id.* at 896); (6) counsel manifested a lack of knowledge of the facts of the case and trial procedure (*id.* at 897); and (7) the court and the State had to frequently intervene to guide counsel through rudimentary trial procedures and correct mistakes that counsel made (*id.* at 899). Thus, counsel in *Baines* clearly failed to conduct any meaningful adversarial testing. *Baines* provides an extreme example of ineffective assistance of counsel that is not analogous to this case.

¶ 48                           3. Failure to Investigate Blood Evidence

¶ 49    The defendant asserts trial counsel was ineffective for her failure to investigate or present evidence concerning the blood found in his sink. First, he argues that she did not test the blood found in his sink. While the State took swabs from the kitchen sink, they never tested them. Counsel stated at the *Krankel* hearing that she did not want to forensically test the blood in case it was Hudson's blood. Had the forensic report established that the blood was Hudson's, counsel may have still been required to present the report to the State, which would have further

16

incriminated the defendant. See *People v. Garza*, 92 Ill. App. 3d 723, 734 (1981); Ill. S. Ct. R. 413(c) (eff. July 1, 1982). Therefore, the decision not to test the blood amounted to trial strategy. *Tucker*, 2017 IL App (5th) 130576, ¶ 26.

¶ 50      Second, the defendant contends that counsel should have, on cross-examination, asked Jennifer about her statement that she cut herself in his kitchen the night of the murder. The decision of whether and how to cross-examine a witness is generally a matter of trial strategy and cannot support a claim of ineffective assistance of counsel. *Tolefree*, 2011 IL App (1st) 100689, ¶ 34. While the defendant states that there was "no risk" for counsel to elicit testimony from Jennifer that she cut herself on that night in question, the defendant has failed to show us how the failure to elicit this testimony was not trial strategy. Moreover, the defendant has not shown how this would have affected the outcome of the case. The State did not test the blood in the sink and there was other testimony that supported that the defendant cleaned the knife in the sink. We find that trial counsel's representation in relation to the blood found in the sink at the defendant's residence was not so unsound as to fail to " 'conduct any meaningful adversarial testing.' " *West*, 187 Ill. 2d at 433 (quoting *Guest*, 166 Ill. 2d at 394).

¶ 51                    4. Failure to Submit an Accomplice Witness Jury Instruction

¶ 52      The defendant claims trial counsel was ineffective for her failure to submit an accomplice witness jury instruction. "The test for determining whether a witness is an accomplice for purposes of the accomplice witness instruction is whether there is probable cause to believe that the witness was guilty of the offense at issue as a principal or as an accessory under a theory of accountability." *People v. Kirchner*, 194 Ill. 2d 502, 541 (2000). The instruction should only be given to the jury if the totality of the evidence and reasonable inferences taken from that

17

evidence show that a person was not just present during the crime, but that he or she participates in the planning or commission of the crime. *People v. Henderson*, 142 Ill. 2d 258, 315 (1990).

¶ 53    Here, the circuit court found that no evidence or testimony was presented that showed either witness (Pelsynski or Jennifer) was involved in the planning or commission of the murder. Based on the evidence of record, this finding is not manifestly erroneous. There was no testimony at trial that Pelsynski or Jennifer did anything other than sit in the car during the commission of the murder. Counsel cannot be ineffective for failing to ask for an instruction that was not supported by the evidence presented.

¶ 54                    5. Failure to Exclude Irrelevant Evidence

¶ 55    The defendant alleges that trial counsel failed to move to exclude evidence that two knives were found in his residence as irrelevant evidence. As the defendant notes, relevant evidence has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). Evidence may be irrelevant if it is "remote, uncertain or speculative." *Id.* at 456. Even relevant evidence is inadmissible where its probative value is outweighed by its prejudicial effect. *People v. DeHoyos*, 64 Ill. 2d 128, 132 (1976); Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 56    First, we note that at the *Krankel* hearing trial counsel testified that she thought it was helpful for the evidence of the two knives to come in so that she could argue that they had not been used in the offense. Therefore, her decision not to move to exclude them amounted to trial strategy. Second, we agree with the court's determination that the knives were relevant. Here, Hudson's wounds were consistent with chop wounds, meaning a heavier-type weapon with at least one sharp cutting edge used in a chopping manner. One example of this type of weapon given by the coroner was a machete. Pelsynski testified that the defendant had a collection of

18

three knives that the defendant had shown Pelsynski, one of which was a machete. Only two knives were found at the defendant's residence. The fact that one knife out of the defendant's collection was missing, and that the two that were there were not machetes, was relevant at trial as the jury could have inferred that the missing knife could have been the murder weapon.

¶ 57                                6. Cumulative Error

¶ 58        Finally, the defendant claims that his trial counsel's errors cumulatively deprived him of a fair trial. However, we have already found that none of the circuit court's findings with regard to trial counsel's representation are manifestly erroneous. Where, as here, the alleged errors do not amount to reversible error on any individual issues, there is no cumulative error. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005).

¶ 59                            B. Prosecutorial Misconduct

¶ 60        The defendant's second argument on appeal is that the State committed prosecutorial misconduct. However, as the State points out, the defendant failed to properly preserve these issues for appellate review. Both a trial objection and a written posttrial motion raising the issue are required for alleged errors that could have been raised during trial. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). While the defendant filed a posttrial motion challenging the conduct of the State, he failed to object at trial. Therefore, these issues were not properly preserved. Nonetheless, the defendant asks that we consider the issues under the plain error doctrine.

¶ 61        Under the plain error doctrine, we must first "determine whether a plain error occurred. "The word 'plain' here 'is synonymous with "clear" and is the equivalent of "obvious." ' " *People v. Hollahan*, 2019 IL App (3d) 150556, ¶ 19 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 n.2 (2007)). If we determine that the circuit court committed a plain error, then the second step is to determine whether the error is reversible. *Id.* A plain error is reversible when

19

"(1) 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) the error is 'so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *Piatkowski*, 225 Ill. 2d at 565). The defendant bears the burden of persuasion under both prongs. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The defendant alleges several acts of misconduct throughout the trial.

¶ 62                                1. Opening Statement

¶ 63        The defendant alleges that the State mentioned evidence in their opening statement that was not presented at trial. The defendant asserts that it was improper for the State to say (1) the evidence would show that the defendant "regularly carries knives," (2) that it would present evidence showing how the police were led to the defendant as a suspect, and (3) that the defendant denied being at the victim's house on the night of the murder.

¶ 64        "The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). An opening statement may also include a discussion of the expected evidence and reasonable inferences that can be drawn from the evidence. *Id.* However, no statement may be made in opening which counsel does not intend to prove or cannot prove. *Id.* Thus, it is improper for a prosecutor to comment during opening statements that certain testimony will be introduced at trial and then fail to produce it. *People v. Rogers*, 42 Ill. App. 3d 499, 502-03 (1976). "Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *Kliner*, 185 Ill. 2d at 127.

¶ 65        First, we find that the State's comment that the defendant regularly carried knives was a reasonable inference from the record. Pelsynski testified that he saw the defendant with knives

20

on several prior occasions in his apartment. He had seen the defendant put a knife in his Carhartt jacket weeks earlier. Pelsynski described the knife he saw in the sink the night of the murder as a "machete-style knife" that he believed he had seen the defendant carry on previous occasions. He also described two other knives that the defendant had shown him before. Jennifer testified that the defendant owned multiple knives and that he had shown her those knives at his apartment.

¶ 66 Second, regarding the State's statement about the police's investigation that led to the defendant, the State provided evidence that Hudson's daughter identified the defendant as one of the three people Hudson allowed in his home. Beyond that testimony, the State did not present specific testimony showing why the police came to investigate the defendant. However, the court instructed the jury both before opening statements and at the conclusion of evidence that the jury should disregard any statements not supported by evidence. Moreover, we note that any such error is reversible only if it amounts to deliberate misconduct and results in substantial prejudice. *Id.* The defendant has failed to show how this omission amounted to deliberate misconduct and prejudiced the defendant. Regardless of how the defendant initially became a suspect, the State provided ample evidence connecting him to the crime.

¶ 67 Last, we acknowledge that the jury did not hear specific testimony that the defendant denied being at Hudson's house the night of February 8, 2016, as mentioned in the State's opening argument. Again, we find no evidence that this statement is attributable to deliberate misconduct, nor that its omission resulted in substantial prejudice to the defendant. See *id.*

¶ 68                                                 2. Leading on Direct

¶ 69 Next, the defendant argues that the State improperly led its witnesses on material matters that resulted in prejudice.

21

"The propriety of asking leading questions is a matter which rests in the sound discretion of the trial court. A reviewing court will not reverse a conviction because the trial court permitted the use of leading questions unless it appears both that the trial court abused its discretion and that such abuse resulted in substantial injury to the defendant." *People v. Taylor*, 132 Ill. App. 2d 473, 484 (1971).

¶ 70                                             a. Jennifer

¶ 71       The defendant points to two instances where he suggests that the State improperly led Jennifer. First, the State questioned Jennifer saying "Did [the defendant] happen to show you anything when you were there?" Jennifer responded that the defendant showed her "a lot of things." The State then sought to narrow Jennifer's response by asking, "Did he show you anything like a bladed weapon?" "Questions merely directing the attention of a witness to the subject-matter of the inquiry are not suggestive or leading in any proper sense." *People v. Schladweiler*, 315 Ill. 553, 556 (1925). There was no objection to this question, which referenced what the State would argue was the murder weapon. Jennifer did not simply agree with the State when responding, but continued to describe exactly what she saw. She testified the defendant showed her a "long, heavy, metal knife" as well as other knives.

¶ 72       Second, when Jennifer was asked, "Did you see him in any way, shape, or form have anything that could be the knife?" She responded, "I—whatever he had, he had it underneath his coat." The State then asked, "so that night—that evening, you didn't see a knife?" and Jennifer responded, "I didn't see him with it when he went into that house or when he came out. No." Again, directing the witness to the subject matter is not improper. Here, even if it was improper,

22

it was not prejudicial. Jennifer ultimately testified that she did not see the defendant with a knife, she was speculating as to why the defendant had his hand under his jacket.

¶ 73                                                b. Pelsynski

¶ 74        The defendant alleges two instances where he argues the State improperly led Pelsynski. First, the defendant alleges that the State led Pelsynski when it asked if the defendant was ever frustrated during a prior drug deal. Pelsynski testified that, several weeks before the murder, the defendant had been frustrated during a drug deal involving Hudson. However, Pelsynski then testified that it was he who was upset when Hudson was taking "so long" because Pelsynski was in a hurry. This did not substantially injure the defendant, particularly where Pelsynski's answer indicated his own frustration as opposed to the defendant's.

¶ 75        Second, the defendant argues that the State's question, "Did he say anything else?" was leading. The question elicited Pelsynski's testimony about the prior statement the defendant made that he "[o]ught to rob [Hudson]. Hit him over the head and rob him," however, the question does not suggest an answer, therefore, the question was not leading.

¶ 76                                          3. Shifting the Burden

¶ 77        Next, the defendant alleges that the State shifted the burden by saying during closing arguments, "I'm not going to read too many of these instructions, but I think two are appropriate based on Ms. Justice's burden. One deals with circumstantial evidence." Moreover, the defendant points to the State's comment that the jury had not heard any evidence to support the theory that the State's witnesses were lying as more proof of burden shifting. "Closing arguments must be viewed in their entirety and the allegedly erroneous arguments must be viewed contextually." *People v. Blue*, 189 Ill. 2d 99, 128 (2000). "Generally, improper closing arguments by the State will constitute reversible error only if there is doubt as to whether the jury

23

would have rendered a guilty verdict in the absence of any improper comments." *People v. Libberton*, 346 Ill. App. 3d 912, 924 (2003).

¶ 78　　　　Taking the State's comments in context, we do not think the State was attempting to shift the burden. We believe, as did the circuit court, that the State's use of the word "burden" was a slip of the tongue. The entirety of the State's argument reflects that it was not stating that the defendant had the burden to prove that Jennifer and Pelsynski lied.

¶ 79　　　　　　　　　　　　　　　　4. Misstated Evidence

¶ 80　　　　The defendant points to several instances where he alleges the State misstated evidence in closing arguments. The defendant again points to statements that he "regularly carries knives," which this court has held was a reasonable inference made by the evidence presented. *Supra* ¶ 65. Additionally, the defendant alleges that it was improper for the State to argue Pelsynski did not know how Hudson died when he told police that the defendant said he "ought to rob [Hudson.] Hit him over the head." We find that this statement was not improper, as it was a reasonable inference that could be gained from the evidence that was presented. Even if the statement was improper, is was not so prejudicial as to deny real justice to the defendant or allow the jury to reach a guilty verdict because of the error. See *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 45. Moreover, we note that the circuit court properly instructed the jurors they "are the judges of the believability of the witnesses" and "any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 81　　　　We find that there was no error by the State in the claims that the defendant alleges. However, even if we were to assume errors were committed, none would rise to the level of reversable plain error. The evidence in this case is not so closely balanced that the error alone threatened to tip the scales of justice or was so serious that it affected the fairness of the

24

defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. See *People v. Euell*, 2012 IL App (2d) 101130, ¶ 15.

¶ 82                                      III. CONCLUSION

¶ 83        The judgment of the circuit court of Peoria County is affirmed.

¶ 84        Affirmed.

¶ 85        JUSTICE McDADE, dissenting:

¶ 86        The majority affirms defendant's conviction for first degree murder, finding in part, that (1) defense counsel provided effective assistance and the trial court did not err when it denied defendant's claims of ineffective assistance of counsel, and (2) the State's comments in closing argument did not shift the burden of proof. Unlike the majority, I would respectfully find that defense counsel's decision not to request an accomplice witness instruction constituted ineffective assistance, and the cumulative effect of the State's misconduct denied defendant a fair trial. I otherwise concur in the majority's resolution of the remaining issues.

¶ 87                          A. Ineffective Assistance of Counsel

¶ 88        From my review, defendant's *Krankel* hearing revealed a critical deficiency in defense counsel's representation—defense counsel failed to request an accomplice witness jury instruction despite the existence of substantial evidence to establish probable cause to believe that Pelsynski and Jennifer participated in the planning or commission of Hudson's murder.

¶ 89        The accomplice witness instruction is intended "to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment." *People v. Hunt*, 2016 IL App (3d) 140786, ¶ 52. The instruction is warranted when the evidence and reasonable inferences drawn therefrom give rise to probable

25

cause to believe that a witness participated in the planning or commission of the crime. *People v. Caffey*, 205 Ill. 2d 52, 116 (2001). The instruction states:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2017) (hereinafter IPI Criminal No. 3.17).

The committee note that follows this instruction "recommends that this instruction *be given any time that an accomplice testifies*." (Emphasis added.) IPI Criminal No. 3.17, Committee Note.

¶ 90    The trial evidence established probable cause to believe that Pelsynski and Jennifer, the State's key witnesses, were not only with defendant before and after Hudson's murder, but were accomplice witnesses in that they participated in the planning or commission of the crime.

¶ 91    Pelsynski's testimony established that he had a motive to commit or at least assist with the murder. Pelsynski initiated the heroin purchase that preceded the murder. When he learned that defendant had delivered an insufficient amount of heroin, Pelsynski became angry and indicated to defendant that he planned to confront Hudson. Pelsysnki attempted to excuse this communication and stated that he assumed defendant was responsible but told defendant he wanted to confront Hudson to see how defendant would react. While the record indicates that Pelsynski permitted defendant to speak with Hudson, instead of Pelsynski's direct confrontation, it does not rule out the significant possibility that Pelsynski encouraged defendant to harm or kill Hudson or planned an attack with defendant. Moreover, Pelsynski enabled defendant to commit the murder as he drove defendant to and from Hudson's residence. Afterward, Pelsynski saw defendant washing what he believed to be blood from a "machete-style knife" in the sink. This

26

knife was consistent with the weapon that inflicted Hudson's fatal injuries. Pelsynski then drove defendant to O'Brien Steel Plant 4 to help him get "rid of something." Although this drive occurred after the murder, it is indicative of Pelsynski's prior intent to help defendant harm Hudson. See *People v. Grabbe*, 148 Ill. App. 3d 678, 688 (1986) (after the fact aid is indicative of an alleged accomplice's intent prior to the offense).

¶ 92    Like Pelsynski, Jennifer was also with defendant before and after the murder. While the record less directly connects Jennifer to the murder, it reasonably indicates that she made some contributions to the planning, commission, and attempted concealment of the murder. Jennifer noted that before the murder defendant seemed upset, and he possessed multiple knives. Thereafter, Jennifer rode with Pelsynski and defendant to and from Hudson's house. This evidence inferentially indicated that Jennifer participated in the planning of Hudson's murder as she was aware of defendant's general anger, knew that he possessed weapons capable of inflicting the injuries that led to Hudson's death, and was present immediately before the murder.

¶ 93    The evidence of the events that transpired after Hudson's murder further indicated that Jennifer had some role in the crime. Defendant told Jennifer that "he killed [Hudson] and he was going to kill [Pelsynski]." Despite having this knowledge, Jennifer did not attempt to notify the authorities and instead hid from the police when they came to arrest defendant. See *People v. Carreon*, 162 Ill. App. 3d 990, 995 (1987) (presence at the scene, sharing in proceeds, and the failure to call the police are significant factors used to determine whether an accomplice instruction was necessary).

¶ 94    I would find that Pelsynski and Jennifer's testimony established probable cause to believe that one or both participated in the planning or commission of Hudson's murder. Therefore, defense counsel's performance was deficient for failing to seek an accomplice witness

27

instruction. I would further find that defendant suffered prejudice from the omitted instruction because the State's case largely relied on Pelsynski and Jennifer's testimony. Had the court given the instruction, it would have asked the jury to view Jennifer's and Pelsynski's testimony with greater suspicion, as they stood only to gain from assisting the State with its prosecution. Given these facts, I would conclude that defense counsel provided ineffective assistance in not requesting the accomplice witness jury instruction, and the trial court erred when it denied defendant's posttrial claims of ineffective assistance of counsel.

¶ 95                                   B. Prosecutorial Misconduct

¶ 96        Defendant raised four allegations of prosecutorial misconduct: (1) the State mentioned evidence in their opening statement that was not presented at trial; (2) the State improperly led Jennifer and Pelsynski during their direct examination; (3) the State misstated the evidence during its closing arguments; and (4) the State's comments during its rebuttal argument improperly shifted the burden of proof. I partially agree with the majority that, when viewed in isolation, each of these arguments does not establish the requisite prejudice to warrant reversal. However, when viewed together, I would find that they establish a pervasive pattern of misconduct that denied defendant a fair trial. See, *e.g.*, *People v. Johnson*, 208 Ill. 2d 53, 84 (2003) ("the coalescence of improper, emotion-laden evidence, and inflammatory argument obviously designed to exploit that evidence created a synergism of parallel errors").

¶ 97        First, the State's mention in its opening statement that defendant regularly carried knives, and when questioned by police, defendant denied being at the victim's residence the night of the murder, was, in my view, improper unsworn testimony. *Rogers*, 42 Ill. App. 3d at 502-03. The State did not present evidence that defendant regularly carried knives, only that he owned knives. Further, the State presented evidence that defendant spoke to the police, however, it failed to

28

elicit defendant's statement that he denied being at the victim's residence. The State gave no other evidence to prove this. The court's instruction that opening statements are not evidence did not, in my view, eliminate the harm in its entirety. See *People v. Bunning*, 298 Ill. App. 3d 725, 729 (1998). While the surviving harm is not, in my opinion, enough to warrant reversal, it begins the accumulation of errors that I would find denied defendant a fair trial.

¶ 98　　　　Second, I would find that the State improperly led Jennifer and Pelsynski during their direct examination on material matters. When Jennifer answered the State's question about whether defendant had shown her anything at his house, she stated that he showed her "a lot of things." Then, the State improperly suggested to Jennifer that defendant showed her a "bladed weapon." The State later argued this "bladed weapon" was the murder weapon, and therefore, a material evidentiary fact. Further, the State established its theory of motive by improperly leading Pelsynski through one instance where defendant showed frustration toward Hudson. The State's leading questions eventually led to Pelsynski's testimony that defendant said he "[o]ught to rob [Hudson]. Hit him over the head and rob him," which the State later argued was more than coincidental considering the manner in which the victim was murdered. The leading questions were impermissible as they directly relate to the State's proposed motive and the murder weapon. See *id.* at 732. Given the material nature of these two matters, I would find the questions were part of the State's pervasive pattern of misconduct.

¶ 99　　　　Third, I would find that the State erred by arguing in closing that defendant regularly carried knives, a fact not proven by the evidence. The only evidence presented to support this argument came from the prosecutor's opening statement. *Supra* ¶ 97. Since the State presented no other evidence to support this conclusion, it improperly used its own testimony to argue that defendant regularly carried knives. While the court's jury instruction was intended to limit the

29

effect of this error, in much the same way one cannot unring a bell, the instruction could not completely remove the unproven allegations from the jury's consideration.

¶ 100    Fourth, I would find that the State's rebuttal statements "I'm not going to read too many of these instructions, but I think two are appropriate based on [Ms. Justice's] burden," and "you haven't heard any evidence to suggest [Pelsynski and Jennifer] have any reason whatsoever to frame a man, any man, for murder let alone a brother, a friend," improperly shifted the burden of proof to defendant. See *People v. Legore*, 2013 IL App (2d) 111038, ¶ 55 (the State has the burden of proving the elements of the charged offense beyond a reasonable doubt, and it may not attempt to shift that burden to defendant). Moreover, because the State made these arguments in its rebuttal argument, they substantially prejudiced the case as defendant was not afforded an opportunity to respond to them. See *id.* Therefore, we cannot say with any certainty that the "improper remarks did not contribute to the defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 101    Overall, I would find that while each of these instances of misconduct does not, by itself, rise to reversible error, together they present a pervasive pattern of prosecutorial misconduct that denied defendant a fair trial. Therefore, I would reverse defendant's conviction and remand the cause for a new trial.